**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| **Plaintiff**, | § § | |
| **v.** | § § | **Case No.: 4:26-cv-2721** |
| **AARON VERDUGO,** | § § | |
| **VERDUGO ENTERPRIZES, LLC** | § | **JURY TRIAL DEMANDED** |
| **D/B/A BDAASWORX, AND** | § | |
| **BDAAS INC.,** | § § | |
| | § § | |
| **Defendants.** | § § | |
| | § | |

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission" or "Plaintiff") files this Complaint against Aaron Verdugo ("Verdugo"), Verdugo Enterprizes, LLC d/b/a BDaaSWorx ("BDaaSWorx"), and BDaaS Inc. ("BDaaS") (collectively "Defendants") and alleges as follows:

**I.
SUMMARY**

1.      From approximately August 2022 through January 2024 (the "Relevant Period"), Verdugo raised approximately $6.67 million from approximately 200 investors in an unregistered securities offering made primarily through two entities that he wholly owned, BDaasWorx and BDaaS (together, "BDX"), based on materially false and misleading statements.

2.      The Defendants offered and sold to investors the opportunity to purchase computer chipset units, along with the management services provided by BDX to install, manage, and maintain the units, which were purportedly going to be deployed in BDX's current

1

infrastructure (the "BDX Power Program").  BDX claimed to operate a data center where it housed and maintained the chipset units it purported to have contracted for use by third parties who required high volume data computation and/or storage services ("big data as a service" or "BDaaS services").  The Defendants promised to maintain and manage the chipset units and secure customers to utilize the chipset units, which would ultimately generate profits for the investors.

3.      Defendants made numerous materially false and misleading statements to investors about fundamental aspects of BDX and the BDX Power Program.  Defendants claimed BDX had established customer relationships with several large Fortune 500 technology companies, among others, and further claimed it was already providing BDaaS services to them.  Investors were promised monthly returns purportedly generated from the payments BDX received from these purported existing customers.  Investors were further promised a quick return of their full investment and a "satisfaction guarantee," whereby investors could receive a full refund of their investment amount, less any returns that they had received during the investment period, if they were not satisfied with their investment for any reason.

4.      In reality, BDX did not have any customer contracts, provide any BDaaS services to any customers, or have any source of revenue.  By early 2023, just months after the Defendants started raising investor funds, they had ceased paying monthly returns to nearly all investors, and the Defendants failed to honor the satisfaction guarantee refunds to all but four investors, which were paid using other investors' funds.  Meanwhile, Verdugo directed BDX staff to make additional misstatements regarding BDX's failure to pay monthly returns.

5.      Unbeknownst to investors, Verdugo also misappropriated at least $6.1 million of investor funds, using approximately $591,000 to pay investors and approximately $5.5 million

to pay unauthorized expenses, of which approximately $4,684,000 was used to pay unauthorized operational expenses and approximately $854,000 was used to pay unauthorized compensation. Except for the $591,000 in investor funds paid to investors as returns or refunds, the remaining investors never received any monthly returns or refunds, which resulted in substantial losses to investors based on their investments.

6.      By committing the acts alleged in this Complaint, Defendants violated Sections 5(a), 5(c), and 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c) and 77q(a)(2)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

7.      The Commission brings this action against the Defendants seeking: (a) injunctive relief; (b) disgorgement of ill-gotten gains; (c) pre-judgment interest on those ill-gotten gains; (d) a civil penalty against Verdugo; and (e) all other equitable and ancillary relief to which the Court determines that the Commission is entitled.

**II.**
**JURISDICTION AND VENUE**

8.      The Court has jurisdiction over this action under Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendants, directly and indirectly, made use of means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the acts, omissions, transactions, practices, and/or courses of business alleged herein.

9.      Venue in this district is proper under Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial part of the events giving rise to the claims occurred within the district, including but not limited to

Defendants' sales of securities, misrepresentations, acts, practices, transactions, and courses of business. Further, Verdugo resides in Humble, Texas, which is located in this district.

10.     Defendants engaged in the acts, omissions, transactions, practices, and/or courses of business described in this Complaint in connection with the offer, purchase, and/or sale of investment contracts through the BDX Power Program, which are securities under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

### III.
### DEFENDANTS

11.     Aaron Verdugo resides in Humble Texas. At all relevant times, Verdugo has been the founder, principal officer, and sole member of BDaaSWorx and the control person of BDaaS.

12.     Verdugo Enterprizes, LLC d/b/a BDaaSWorx is an Arizona limited liability company with its principal place of business in Tempe, Arizona. Verdugo is the founder, sole member and principal officer of BDaaSWorx. Verdugo formed and operated several companies under the name "BDaaSWorx" or "BDaaS," but corporate formalities were not observed between the various entities, and these entities appear to have been used somewhat interchangeably during the Relevant Period with general references to "BDaaSWorx," "BdaaS," "BDX," and the "BDX Power Program" in marketing materials, including written sales presentations and BDX's website. As such, representations and other information provided to investors about the offering were made by BDaaSWorx and BDaaS interchangeably at various times throughout the Relevant Period. BDaaSWorx and BDaaS are collectively referred to as "BDX" throughout this Complaint.

13.     BDaaS Inc. is a Wyoming corporation with its principal place of business in

4

Sheridan, Wyoming. Verdugo is the control person of BDaaS.

## IV.
## STATEMENT OF FACTS

**A.      Background.**

14.      In August 2022, Verdugo launched the BDX Power Program which offered investors in multiple states the opportunity to purchase computer chipset units, along with management services provided by BDX to install, manage and maintain the units. BDX claimed to operate a data center in Houston, Texas where it housed and maintained computer hardware (i.e., chipset units). The Defendants claimed that BDX had contracts for use of the chipset units housed at its data center with third parties who required high volume data computation and/or storage services. The Defendants claimed that they had established customer relationships with Fortune 500 technology companies, among others, and further claimed that chipsets purchased through the BDX Power Program would purportedly be installed to power BDX's existing infrastructure and support BDX's existing customers. In exchange for their investment, investors were promised monthly payments purportedly generated from the payments BDX received from its existing customers.

**B.      Sale of the BDX Power Program Securities**

15.      Depending on when investors participated in the BDX Power Program, investors made a one-time payment between approximately $8,300 and $12,300, which, according to the Defendants, BDX would purportedly use to purchase, install, and program the chipset unit. More than half of the investors in the BDX Power Program purchased more than one chipset unit or made multiple investments with BDX. Most investors sent their money via wire transfer to BDX's bank accounts, which were owned and controlled by Verdugo. Investor funds were

pooled and commingled in these accounts and subsequently used by Verdugo to make payments to investors and for various unauthorized expenses.

16. The Defendants utilized a sales team to promote the BDX Power Program, which were internally referred to as "Authorized Dealers." Several of the Authorized Dealers were investors themselves in the BDX Power Program. Verdugo recruited an individual to lead the sales and marketing efforts of the Authorized Dealers, and to help facilitate communications with investors. This individual was responsible for overseeing the sales process and preparing marketing materials and other offering documents based upon information provided to him by Verdugo, all of which were provided to Verdugo for his review and approval before distributing to potential investors. Once approved, these marketing materials were provided to the Authorized Dealers who then distributed them to potential investors on BDX's public website and by email, text, phone, and social media platforms. Verdugo occasionally attended in-person and video meetings with potential investors where he would describe the BDX Power Program and BDX's infrastructure and technology.

17. When an investor agreed to invest in the BDX Power Program, they entered into a Services Agreement with BDX in which BDX agreed to provide ongoing services to investors as a part of the investment. Specifically, BDX agreed to install, manage, and maintain the investors' chipset units, including programming and configuring the units to provide data processing and storage services for BDX's customers. Investors were to receive a pro rata share of the profits generated from the deployment of their respective chipset unit(s) to power BDX's infrastructure. Investors were fully reliant on the Defendants to operate the data center, manage and maintain the chipset units, and generate the promised returns. As noted in BDX's written sales presentations and on its website, the BDX Power Program promised investors "passive income," that they could

6

make money while they slept, and that their participation in the program required zero hours from them.

**C.      The BDX Power Program was an Unregistered Securities Offering**

18.      The BDX Power Program was a securities offering because investments in the program constituted investment contracts under the federal securities laws. Investors invested money by wiring funds to BDX bank accounts, where the money was pooled with other investors' funds. After sending their money to the Defendants, the investors had no decision-making authority regarding how BDX would use their funds and they had no control over the success of their investments. Instead, investors collectively relied on the efforts and expertise of the Defendants to generate sufficient revenues to pay the monthly returns and to uphold their obligations under the satisfaction guarantee, which is discussed in more detail below.

19.      Investors expected their profits solely from the efforts of the Defendants and were entirely passive. Investors had no control over, or insight into, what was done with their money after they sent it to BDX. The investors had to rely on the Defendants for the success or profitability of the purported investment because they did not have the requisite knowledge to manage or maintain the chipset units or to operate the data center, all of which BDX claimed to engage in to generate its revenue. Investors were not given any information or access that would have allowed them to participate in the operation of the data center.

20.      During the Relevant Period, the Defendants raised at least $6.67 million from approximately 200 investors in multiple states through the offer and sale of investment contracts related to the BDX Power Program. The Defendants used in-person events, BDX's public website, email, text, phone, and social media platforms to solicit investors, many of whom did not have preexisting, substantive relationships with the Defendants or the Authorized Dealers.

21. The BDX Power Program offering was not registered with the Commission. Further, the Defendants did not attempt to verify that investors were accredited investors and, in fact, accepted investments from unaccredited investors.

**D.      Misrepresentations Regarding the BDX Power Program**

*i.        Statements Regarding BDX's Existing Customer Relationships*

22. During the Relevant Period, the Defendants made numerous false and misleading statements to investors regarding BDX's existing relationships with data services customers. For example, in offering materials provided to investors, including written sales presentations, the Defendants included a false and misleading statement that BDX provided services to several Fortune 500 companies, among others. The Defendants made similar false and misleading statements touting BDX's established customer relationships with several Fortune 500 companies on its website, and during in-person sales presentations to investors. The corporate logos for the Fortune 500 companies were prominently featured in the BDX offering materials.

23. These statements were false and misleading because, while the Defendants did undertake some effort to set up its business operations, such as renting office space, purchasing computer equipment and hardware, and securing bookkeeping software, BDX did not provide BDaaS services to any customers, let alone Fortune 500 companies, during the Relevant Period.

*ii.       Statements Regarding BDX's Investment Returns and Satisfaction Guarantee*

24. The Defendants also made false and misleading statements regarding BDX's successful track record and the returns investors could expect to receive from investing in the BDX Power Program. Included in written sales presentations provided to investors, investors were promised "incredible earnings" with most investors recouping their full investment within approximately four to nine months. In other written sales presentations provided to investors, the

Defendants promised investors "100% Success" with all investors earning returns within 90 days after investing in the BDX Power Program. Similar claims were repeated on BDX's public website. Investors were further promised "passive income" and the ability to "make money while [they] sleep" as the chipset earned income from the BDaaS services. Investors were told to expect monthly returns between $480 - $2,000 per chipset for the life of the unit, which would typically continue for 7-10 years.

25.    While BDX acknowledged to investors that the expected rate of return was not guaranteed, the Defendants promised a satisfaction guarantee to provide another type of investor protection for the BDX Power Program. This satisfaction guarantee was presented to investors in the Services Agreement, in written sales presentations, and on BDX's website. Investors were told they could receive a full refund of their investment amount, less any returns they had received during the investment period if they were not satisfied with the investment for any reason. Investors could elect to exercise their satisfaction guarantee after an initial 12-month term, which was later extended to a 24-month term.

26.    In reality, BDX's offering materials misrepresented the performance and potential returns of the BDX Power Program, while understating the risks of the investment. At the time the Defendants were making such representations to investors, the BDX Power Program had just launched and did not have any operating history. Further, the expected monthly returns promised to investors were arbitrary, because BDX did not have any customer contracts or other source of revenue. In fact, by early 2023, the Defendants had ceased paying returns to nearly all investors. The satisfaction guarantee was also misleading because BDX was not generating any revenues and had no source of funds – aside from funds from investors – that could be used to provide a full refund if an investor elected to receive one. Despite many demands, the Defendants failed to

provide refunds to all but four investors. Ultimately those that did receive a refund or return only did so after the Defendants received money from new investors.

**E.　Defendants' Use of Investor Funds**

27.　In offering materials provided to investors, including written sales presentations and the Services Agreement, the Defendants represented to investors their funds would be allocated to purchase the chipset units and the installation and programming of the units by BDX. As part of the BDX Power Program offering, the Defendants provided each investor with an invoice reflecting the purported allocations of their investment funds. These invoices were false.

28.　The Services Agreement provided that BDX would withhold a 20% service fee on all earnings withdrawals made by investors from their account. It was this service fee, not investor funds, that was meant to cover BDX's ongoing operational expenses for the data centers used to store the chipset units, along with the labor required to service, maintain, and manage the chipset units. However, BDX did not have any customer contracts to generate earnings and the majority of investors never received any earnings withdrawals from BDX from which the Defendants could withhold the service fee.

29.　When investors contacted BDX regarding missed or lower than expected payments, the Defendants made additional misstatements regarding the payment delays, including blaming programming errors, BDX not receiving customer payments because of changes in business practices by vendors, an internal "audit" to improve BDX's process, and the creation of a waiting list for refunds. In reality, BDX did not have any customer contracts and was not generating any revenue to pay the monthly returns or to meet its refund obligations. By the end of the Relevant Period, BDX stopped responding to investor inquiries and complaints and investors stopped receiving any information regarding their investment in the BDX Power

Program.

30.     After receiving investor funds sent to the BDX bank accounts he controlled, Verdugo misappropriated investor funds to make payments to investors, and for unauthorized expenses.  Bank records indicate Verdugo misappropriated at least $6.1 million of investor funds, of which he made approximately $591,000 in payments to investors as returns and refunds.  In addition, out of the misappropriated investor funds, Verdugo made payments for unauthorized expenses totaling approximately $5.5 million, of which approximately $4,684,000 was used to pay unauthorized operational expenses and approximately $854,000 was used to pay unauthorized compensation, including paying for a luxury vehicle, transferring funds to his spouse, and making credit card payments for personal expenditures.

## V.
## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and
Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]**

*Against all Defendants*

31.     Plaintiff re-alleges and incorporates paragraphs 1-30 of this Complaint by reference as if set forth verbatim in this Claim.

32.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in connection with the purchase or sale of a security, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness, made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

11

33.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)]

### *Against all Defendants*

34.     Plaintiff re-alleges and incorporates paragraphs 1-30 of this Complaint by reference as if set forth verbatim in this Claim.

35.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, have knowingly, with severe recklessness, or negligently, obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

36.     By reason of the foregoing, Defendants have violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## THIRD CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 773(a) and 77e(c)]

### *Against all Defendants*

37.     Plaintiff re-alleges and incorporates paragraphs 1-30 of this Complaint by reference as if set forth verbatim in this Claim.

38.     By engaging in the acts and conduct alleged herein, Defendants, directly or

12

indirectly:

  a. made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect;

  b. for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or

  c. made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement had been filed.

39. There were no applicable exemptions from registration.

40. By engaging in the conduct described above, Defendants have violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**VI.**
**JURY DEMAND**

41. The SEC demands a trial by jury on all issues that may be so tried.

13

## VII.
## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

A.      Permanently restraining and enjoining Defendants from violating Sections 5(a), 5(c), and 17(a)(2) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

B.      Restraining and enjoining Defendant Verdugo, for a period of five years, from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

C.      Ordering Defendants to disgorge, on a joint-and-several basis, all ill-gotten gains they received as a result of the conduct alleged herein, together with prejudgment interest on those amounts, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

D.      Ordering Defendant Verdugo to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

E.      Granting such other and further relief as this Court may determine to be just and necessary.

14

Dated:  April 6, 2026

Respectfully submitted,

/s/ Matthew J. Gulde
Illinois Bar No. 6272325
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
Telephone: (817) 978-3821
Facsimile: (817) 978-4927
guldem@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission